**IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| **ALEXAM, INC.** § | | |
| **Plaintiff** § | | |
| § | | |
| **V.** § | | **No. 2:10CV93** |
| § | | |
| **BEST BUY CO., INC., ET AL.** § | | |
| **Defendants** § | | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff's Opening Claim Construction Brief (Docket Entry #137), Defendants' Responsive Claim Construction Brief (Docket Entry #145), Best Buy's Responsive Brief on Claim Construction (Docket Entry #146), Home Depot's Responsive Brief on Claim Construction (Docket Entry #147), and Plaintiff's Claim Construction Reply Briefs (Docket Entry #s149, 151, 153).  Also before the Court are the Local Patent Rule ("LPR") 4-5 Joint Claim Construction Chart (Docket Entry #158).  A claim construction hearing, in accordance with *Markman v. Westview Instruments*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), was held in Texarkana on March 8, 2012. After hearing the arguments of counsel and reviewing the relevant pleadings, presentation materials, other papers, and case law, the Court finds the disputed terms of the patents-in-suit should be construed as set forth herein.

## I. BACKGROUND

This case involves claims of patent infringement brought by the plaintiff, Alexsam, Inc. ("Alexsam"), against seven issuers of electronic gift cards: Barnes & Noble, Inc. and Barnes & Noble Marketing Services Corp. ("Barnes & Noble"), The Gap, Inc. and Direct Consumer

Services, LLC ("The Gap"), J.C. Penney Company, Inc. and J. C. Penney Corporation ("J.C. Penney"), McDonald's Corporation and P2W, Inc. ("McDonald's"), Toys "R" Us — Delaware, Inc. and TRU-SVC, LLC ("Toys "R" Us"), Best Buy Stores LP ("Best Buy"), and The Home Depot, U.S.A., Inc. and Home Depot Incentives, Inc. ("Home Depot").  Barnes and Noble, the Gap, J.C. Penney, McDonald's, and Toy's R Us are all represented by the law firm of Kaye Scholer, LLP (collectively the "Kaye Scholer Defendants").

Alexsam's patents, U.S. Patent Nos. 6,000,608 ("the '608 patent") and 6,189,787 ("the '787 patent") each relate to stored value/debit cards such as gift cards, phone cards, and medical savings account cards.  Alexsam asserts that it is the owner and assignee of the '608 and '787 patents, and "is in the business of licensing its patented technology." Second Am. Compl. at ¶¶ 2, 27, 82. The '608 patent issued on December 14, 1999 and lists Robert E. Dorf as the sole inventor. The '608 patent generally claims a multifunction card system for activating and recharging accounts associated with various types of cards.

The '787 patent issued on February 20, 2001 from a continuation of Application No. 08/891,261, which resulted in the issuance of the '608 patent. As a continuation of the '608 patent, the '787 patent lists the same inventor and contains the same specification as the '608 patent. Like the '608 patent, the '787 patent generally claims a multifunction card system for activating and recharging accounts associated with various types of cards.

## II. LEGAL PRINCIPLES

A determination of patent infringement involves two steps.  First, the patent claims are construed, and, second, the claims are compared to the allegedly infringing device. *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1455 (Fed. Cir.1998) (*en banc*).

The claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).   In claim construction, courts examine the patent's intrinsic evidence to define the patented invention's scope. *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001).

The legal principles of claim construction were reexamined by the Federal Circuit Court of Appeals in *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).   Reversing a judgment of non-infringement, an *en banc* panel specifically identified the question before it as: "the extent to which [the court] should resort to and rely on a patent's specification in seeking to ascertain the proper scope of its claims." *Id.* at 1312.   Addressing this question, the Federal Circuit specifically focused on the confusion that had amassed from its scattered decisions on the weight afforded dictionaries and related extrinsic evidence as compared to the intrinsic record. Ultimately, the court found that the specification, "informed, as needed, by the prosecution history," is the "best source for understanding a technical term." *Id.* at 1315 (*quoting Multiform Dessicants, Inc. v. Medzam, Ltd.,* 133 F.3d 1473, 1478 (Fed. Cir. 1998).   However, the court was mindful of its decision and quick to point out that *Phillips* is not the swan song of extrinsic evidence, stating:

> [W]e recognized that there is no magic formula or catechism for conducting claim construction. Nor is the court barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence.

*Phillips*, 415 F.3d at 1324.   Consequently, this Court's reading of *Phillips* is that the Federal Circuit has returned to the state of the law prior to its decision in *Texas Digital Sys. v. Telegenix,*

3

*Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), allotting far greater deference to the intrinsic record than to extrinsic evidence.  "[E]xtrinsic evidence cannot be used to vary the meaning of the claims as understood based on a reading of the intrinsic record."  *Phillips*, 415 F.3d at 1319.

Additionally, the Federal Circuit in *Phillips* expressly reaffirmed the principles of claim construction as set forth in *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed. Cir.1995) (*en banc*), *aff'd,* 517 U.S. 370 (1996), *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996), and *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111 (Fed. Cir. 2004). Thus, the claim-construction principles taught by these cases remain in force. Claim construction is a legal question for the court. *Markman*, 52 F.3d at 979.  The claims of a patent define that which "the patentee is entitled the right to exclude."  *Innova*, 381 F.3d at 1115. And the claims are "generally given their ordinary and customary meaning" as the term would mean "to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *Vitronics*, 90 F.3d at 1582.  However, the Federal Circuit stressed the importance of recognizing that the person of ordinary skill in the art "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313.

Advancing the emphasis on the intrinsic evidence, the *Phillips* decision explains how each source, the claims, the specification as a whole, and the prosecution history, should be used by courts in determining how a skilled artisan would understand the disputed claim term. *See, generally, id.* at 1314-17.  The court noted that the claims themselves can provide substantial guidance, particularly through claim differentiation.  Using an example taken from the claim

language at issue in *Phillips*, the Federal Circuit observed that "the claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel." *Id.* at 1314. Thus, the "context in which a term is used in the asserted claim can often illuminate the meaning of the same term in other claims." *Id.* Likewise, other claims of the asserted patent can be enlightening, for example, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315 (*citing Liebel-Flarsheim Co. v. Medrad, Inc.*, 358F.3d 898, 910 (Fed. Cir. 2004)).

Still, the claims "must be read in view of the specification, of which they are part." *Markman,* 52 F.3d at 978. In *Phillips*, the Federal Circuit reiterated the importance of the specification, noting that "the specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.' " 415 F.3d at 1315 (*quoting Vitronics*, 90 F.3d at 1582). To emphasize this position, the *Phillips* court cites extensive case law, as well as "the statutory directive that the inventor provide a 'full' and 'exact' description of the claimed invention." *Id.* at 1316 (*citing Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003)); *see also* 35 U.S.C. § 112, ¶ 1. Consistent with these principles, the court reaffirmed that an inventor's own lexicography and any express disavowal of claim scope is dispositive. *Id.* at 1316. Concluding this point, the court noted the consistency with this approach and the issuance of a patent from the Patent and Trademark Office and found that "[i]t is therefore entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims." *Id.* at 1317.

Additionally, the *Phillips* decision provides a terse explanation of the prosecution history's utility in construing claim terms.  The court simply reaffirmed that "the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* (*citing Vitronics*, 90 F.3d at 1582-83).  It is a significant source for evidencing how the patent office and the inventor understood the invention. *Id.*

Finally, the Federal Circuit curtailed the role of extrinsic evidence in construing claims. In pointing out the less reliable nature of extrinsic evidence, the court reasoned that such evidence 1)  is by definition not part of the patent, 2) does not necessarily reflect the views or understanding of a person of ordinary skill in the relevant art, 3)  is often produced specifically for litigation, 4) is far reaching to the extent that it may encompass several views, and 5) may distort the true meaning intended by the inventor. *See id.* at 1318.  Consequently, the Federal Circuit expressly disclaimed the approach taken in *Texas Digital*.  While noting the *Texas Digital* court's concern with regard to importing limitations from the written description – "one of the cardinal sins of patent law," the Federal Circuit held that "the methodology it adopted placed too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history." *Id.* at 1320. Thus, the court renewed its emphasis on the specification's role in claim construction.

Many other principles of claim construction, though not addressed in *Phillips*, remain significant in guiding this Court's charge in claim construction.  The Court is mindful that there is a "heavy presumption" in favor of construing claim language as it would be plainly

6

understood by one of ordinary skill in the art. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999); *cf. Altiris, Inc., v. Symantec Corp.*, 318 F.3d 1364, 1372 (Fed. Cir. 2003) ("[S]imply because a phrase as a whole lacks a common meaning does not compel a court to abandon its quest for a common meaning and disregard the established meaning of the individual words."). The same terms in related patents are presumed to carry the same meaning. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("We presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning.") "Consistent use" of a claim term throughout the specification and prosecution history provides "context" that may be highly probative of meaning and may counsel against "[b]roadening of the ordinary meaning of a term in the absence of support in the intrinsic record indicating that such a broad meaning was intended . . . ." *Nystrom v. TREX Co.*, 424 F.3d 1136, 1143-46 (Fed. Cir. 2005).

Claim construction is not meant to change the scope of the claims but only to clarify their meaning. *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) ("In claim construction the words of the claims are construed independent of the accused product, in light of the specification, the prosecution history, and the prior art. . . . The construction of claims is simply a way of elaborating the normally terse claim language[] in order to understand and explain, but not to change, the scope of the claims.") (citations and internal quotations omitted). Regarding claim scope, the transitional term "comprising," when used in claims, is inclusive or open-ended and "does not exclude additional, unrecited elements or method steps." *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1235 (Fed. Cir. 2005) (citations omitted). Claim constructions that read out a preferred embodiment are rarely, if ever, correct. *Vitronics*, 90 F.3d

7

at 1583-84.

While claim construction is a matter for the Court, it need not provide a new definition or rewrite a term, particularly when the Court finds the term's plain and ordinary meaning is sufficient.  The Federal Circuit addressed this issue in *O2 Micro International Ltd v. Beyond Innovation Technology Co.*,  521 F.3d 1351 (Fed. Cir. 2008).  In *O2 Micro*, the Federal Circuit considered the term "only if" in independent claim 1 which requires "a DC/AC converter circuit comprising: a feedback control loop circuit . . . adapted to generate a second pulse signal . . . only if said feedback signal is above a predetermined threshold."  *Id.* at 1356.  The defendant asserted that its controllers did not satisfy the limitation of claim one because there were circumstances where the feedback signal controlled power to the load "even though the feedback signal falls below the predetermined threshold."  *Id.*  Two defendants had asked the district court to construe the term "only if" to mean "exclusively or solely in the event that," another defendant argued the term to mean "never except when," and the plaintiff argued that no construction was needed.  *Id.* at 1357. The district court had noted that there was a dispute as to whether "only if" would have an exception but chose to rule that the term needed no construction.  *Id.*

The Federal Circuit noted that "[a]t trial, the 'only if' limitation was a key issue disputed by the parties."  *Id.* at 1358.  The Federal Circuit stated that the "purpose of claim construction is to 'determin[e] the meaning and scope of the patent claims asserted to be infringed."  *Id.* at 1360 (*citing Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc)).  The Federal Circuit clarified that "[w]hen the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."  *Id.* (*citing Markman*, 52

F.3d at 979).  The primary dispute, as acknowledged by the district court, was whether the "only if" limitation applied during the "the steady state operation of the switching circuit" or at all times without exception.  *Id.* at 1360.  The Federal Circuit noted that the parties had agreed to the "meaning" of the term but not to the claim's "scope."  *Id.* at 1361.  The Federal Circuit stated that "[a] determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."  *Id.*  The Federal Circuit found that the district court's failure to construe "only if" effectively allowed the jury to construe the term. *Id.* at 1362.   The Federal Circuit also recognized, however, that "district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims."  *Id.* (emphasis in original) (*citing Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)).

As explained by one district court, there is a heavy presumption that a claim term carries its ordinary meaning.  *Bd. of Trustees of the Leland Stanford Junior University v. Roche Molecular Sys.*, 2007 U.S. Dist. LEXIS 87219, at *19 (N.D. Cal. Nov. 27, 2007) (*citing Phillips*, 415 F.3d at 1314).   The court further explained that some terms, such as "therapeutically effective," are commonplace terms that a juror could understand without further direction from the court.  *Id.*  The court found that the terms "do not need to be construed because they are neither unfamiliar to the jury, confusing to the jury, nor affected by the specification or prosecution history."  *Id.* at *19-*20 (*citing Ethicon*, 103 F.3d at 1568 ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to

explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy.")).  However, the Federal Circuit held that "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."  *O2 Micro*, 521 F.3d at 1362.

The Court concludes that when two parties offer different constructions, or if one side argues for ordinary meaning, then the Court must first determine whether it has a duty to resolve the meaning and the scope.  While it is a district court's duty is to construe the claims, part of this duty is to determine the extent which to construction is even necessary.  With regard to meaning, where additional language may be unduly limiting, confusing, or redundant, it is in a court's power to determine that no construction is necessary.  A court may decline to adopt constructions that violate claim construction doctrine, such as improperly importing limitations, and may still construe terms to have their ordinary meaning. *See id.* at 1360.

Guided by these principles of claim construction, this Court directs its attention to the '608 and '787 Patents and the disputed claim terms.

### III. THE PATENTS-IN-SUIT

#### A.    Background of the patents-in-suit

The '608 and '787 patents are entitled "multifunction card system" and describe a system accessible from retail point-of-sale ("POS") terminals.  The '608 patent explains that at the point-of-sale, a retailer has an existing POS device, such as a card swipe machine, cash register, or computer terminal. A gift, loyalty, or phone card has a magnetic strip, similar to a credit or debit card, with a card number encoded on the strip. The card number includes a bank identification number which the retailer's POS device is able to read.

The claims at issue in this case relate to "electronic gift certificate cards" and prepaid debit cards. The patent specification describes the Electronic Gift Certificate Card and related system as follows:

> The multifunction card system 108 of the present invention is also capable of providing an Electronic Gift Certificate™ (EGC) card 101 for a retail issuer. Such a card 101 could be sold by the retail issuer for making purchases only in the retail issuer's stores or for use in a plurality of stores. As in the phone card context, the customer would ask the sales clerk for an Electronic Gift Certificate™ card of the desired amount. If the customer already has an Electronic Gift Certificate™ card, he or she might ask the clerk to add the desired amount to the already existing balance. The clerk swipes the card 101 and enters the transaction amount, either directly or using a nominal amount and/or the PIN pad, depending upon whether the debit network 107 is to be used. Using one of the methods discussed above, the data then makes its way to the processing hub 103.
>
> Alternatively, the activation could occur by processing the card 101 as a typical debit card using the debit network 107. In such a case, the retail issuer would maintain accounts with the sponsor bank. When an activation transaction takes place, the bank would transfer the activation amount from a general account to an account corresponding to the card. . . . .
>
> Upon receipt of the transaction data, the hub 103 recognizes the card 101 as being an Electronic Gift Certificate™ card of the retail issuer and activates or recharges the card 101 in the appropriate amount in an EGC database 205 maintained at the processing hub 103.

'608 Patent at 7:34-8:2.

The novel aspect of the invention is the use of the bank identification number in connection with the card number to take advantage of existing POS devices. At the time of the application, existing POS terminals were pre-programmed to read bank identification numbers associated with card issuing institutions. By incorporating a bank identification number into the card number, the inventor created a system that did not require the retailers to modify and pre-program their existing POS terminals. *Alexsam v. Datastream Card Services Ltd.,* Cause No.

2:03cv337 (Docket Entry #199 at pgs. 1-2).

The system allows the retail clerk to activate the cards at the point of sale and route the information to the processing hub which creates an account. When a user makes a card purchase, the system routes the data to a processing hub which compares the purchase price to the balance and issues an approval code back to the retailer and decrements the balance or declines the transaction if there is an insufficient balance on the card. The system also enables a user to re-charge the account balances. Finally, the system enables the use of "smart cards" which can perform multiple functions (such as a gift certificate coupled with a pre-paid phone card). *Id.* at pg. 2.

**B.      Prior litigation and claim construction ruling**

The '608 and '787 patents have been asserted in other lawsuits in the Eastern District of Texas. Three such cases were previously dismissed pursuant to settlement agreements with the various named defendants, and two recently reached jury verdict. This district has conducted five claim construction hearings and issued five prior claim construction orders relating to the patents-in-suit. Judge Ward issued claim construction rulings in *Alexsam v. Datastream Card Services Ltd.,* Cause No. 2:03cv337 (Docket Entry #199)("the *Datastream* Order"); *Alexsam v. Humana*, Cause No. 2:07cv288 (Docket Entry # 114)("the *Humana* Order") and *Alexsam v. IDT Corp.*, Cause No. 2:07cv420 (Docket Entry #105)("the *IDT* Order"). Judge Everingham subsequently issued claim construction rulings in *Alexsam v. UnitedHealth Group*, Cause No. 2:07cv512 (Docket Entry # 102)("the *UnitedHealth* Order") and *Alexsam, Inc. v. Pier 1 Imports*, Cause No. 2:08cv15 (Docket Entry #157) ("the *Pier 1* Order").

12

C.       **Reexamination**

The '608 and '787 patents have each been the subject of reexamination proceedings at the Patent Office. Presently, claims 1, 3-5, 8, 16-19, 23, 26-28, 34, 36-37, 39-41, 44, 50, 52, 57-58, 60, 62-63, and 65 of the '608 patent stand rejected in Reexamination No. 90/009,793. *See* June 7, 2011 Office Action in Reexamination No. 90/009,793. Additionally, claims 1-4, 19, 20, 23, and 24 of the '787 patent stand rejected in Reexamination No. 90/009,789. *See* June 6, 2011 Office Action in Reexamination No. 90/009,789.

## IV.  CLAIM CONSTRUCTION

A.       **Agreed Claim Terms**

The parties have agreed on the proposed constructions of thirteen claim terms appearing in the claims asserted by Alexsam in this case. The Court incorporates the parties' agreed constructions in attached Exhibit A.  The parties have also agreed that "electronic gift certificate activation amount is entered at the point-of-sale device" and "entering the activation amount into the point-of-sale device/entering an activation amount into said point-of-sale device" no longer require construction.

B.       **Disputed Claim Terms**

The Kaye Scholer Defendants address issues in their brief regarding the following four patent terms: "banking network;" "bank processing hub computer;" "unmodified existing standard (retail) point-of-sale device;" and "pre-existing standard retail point-of-sale device." Unless otherwise indicated, Home Depot joins in the constructions proposed by the Kaye Scholer Defendants.  Best Buy filed its own responsive brief, addressing the "swiping" term. Unless otherwise indicated, Home Depot joins in the construction proposed by Best Buy. The

remaining issues before the Court relate to the disputed constructions of two limitations that include the word "encoded."

**1.    "Banking Network"**

a.    Parties' Positions

"Banking network" is present in claims 1, 8, 34, 44, 50, 57, 60, and 63 of the '608 Patent. The asserted independent claims 1 and 19 (and dependent claim 2) of the '787 patent also require the use of a "banking network" for communicating electronic gift certificate card activation data between a "pre-existing standard retail point-of-sale device" and a "bank processing hub computer."

Claim 1 of the '787 patent recites as follows:

1. A multifunction card system, comprising:

> a. at least one electronic gift certificate card having a unique identification number encoded on it, said identification number comprising a bank identification number approved by the American Banking Association for use in a **banking network**, said identification number corresponding to said multifunction card system;

> b. a bank processing hub computer under bank hub software control and in communication over a **banking network** with a pre-existing standard retail point-of- sale device, said bank processing hub computer receiving electronic gift certificate card activation data when said electronic gift certificate card is swiped through said point-of-sale device, said electronic gift certificate card activation data comprising said unique identification number of said electronic gift certificate card and an electronic gift certificate activation amount; and

> c. a gift certificate card computer under gift certificate card software control and in communication with said bank processing hub for activating a gift certificate card account in a gift certificate card database corresponding to said electronic gift certificate card, said gift certificate card account comprising balance data representative of an electronic gift certificate activation amount.

'787 patent at 11:45-12:4.

Independent claim 19 recites similar subject matter in the form of a method claim. '787 patent at 14:45-15:3.

| Alexam | Defendants |
|---|---|
| A set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions. | A set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions *that incorporates and utilizes a bank processing hub computer*. |

b.    Court's Construction

In *Datastream*, Judge Ward construed "banking network" as "a set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions." *Datastream* Order at pg. 11.   Judge Ward rejected the *Datastream* defendants' proposed construction: "terminals, computers and processors *of multiple banks, issuers, and third-party processors* that are linked together for the purpose of processing financial transactions, *and which incorporates and utilizes a bank processing hub*." *Id.* (emphasis added).

In the *IDT* case, Judge Everingham adopted Judge Ward's construction of "banking network" as "a set of interconnected computers used by banks and financial institution for purposes of conducting and processing financial transactions," while adding the qualifier "and which incorporates and utilizes a processing hub." *IDT* Order at pg. 14. Judge Everingham rejected IDT's proposal that "banking network" as used in the claims must incorporate and utilize a *bank* processing hub. Judge Everingham explained as follows:

> IDT asks the Court to modify its previous construction for 'banking network,' which appears in many of the asserted claims. IDT relies on the prosecution history, during which the patentee argued that 'a banking network necessarily, by virtue of its being a banking network, incorporates and utilizes a banking

15

processing hub.' *See* Def. Br. at 14. IDT identifies no error in the Court's prior construction, but its argument is nonetheless persuasive. **However, the Court disagrees that the banking network necessarily includes a bank processing hub.** See '608 Patent, Fig. 2 (processing hub 103 includes three different databases; databases of this type would not ordinarily be found in a bank processing hub). See also '608 patent, 5:4–8 (indicating clearly that the processing hub of the invention is not limited to a bank processing hub).

*Id*. (emphasis added).

Here, Defendants seek to construe the term "banking network" to require a network "that incorporates and utilizes a bank processing hub computer." According to Defendants, the construction of "banking network" as "a set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions" is sound but incomplete, and additional language should be added in order to render the construction consistent with the inventor's statements to the Patent Office in obtaining his patents. Specifically, Defendants assert the inventor, in distinguishing the prior art, explicitly informed the Patent Office that the claimed "banking network" "incorporates and utilizes a bank processing hub computer."

On July 10, 1997, the inventor, Mr. Dorf, filed the original application that issued as the '608 patent, U.S. Application No. 08/891,261 ("the '261 Application"). On April 19, 1999, the examiner rejected claims 16-17, 23, 26-28, 57, and 60-65 as anticipated by U.S. Patent No. 5,577,109 ("Stimson"); claims 18-19 as obvious over Stimson; claims 1-5, 8-11, 34-44, and 50-54 as obvious over the combination of Stimson and U.S. Patent No. 5,815,561 ("Nguyen"); claims 6-7, 12-15, 45, 47-49, and 55-56 as obvious over the combination of Stimson, Nguyen, and U.S. Patent No. 5,530,232 ("Taylor"); claims 20-22, 24-25, 29-31, and 66 as obvious over the combination of Stimson and Taylor; and claims 58-59 as obvious over the combination of

16

Stimson and Bertina.

After this Office Action, Mr. Dorf's attorneys conducted telephonic interviews with the examiner on June 21 and June 24, 1999. As a result of those interviews, on June 24, 1999, Mr. Dorf amended claims 1, 9, 12, 16, 18, 20-21, 23, 27, 29, 32-34, 39, 50, 53, 55, 57, and 60 by further describing the claimed "bank identification number" as "approved by the American Banking Association for use in a banking network." According to Defendants, based on the remarks submitted with this amendment, Mr. Dorf understood that this amendment would distinguish the claims from the Stimson reference:

> The Examiner and the undersigned have reached agreement, for which the undersigned thanks the Examiner, that the claims as herein amended distinguish over Stimson since Stimson fails to teach the incorporation of an ABA approved bank identification number as part of the card identification number of a card to be activated, nor does it teach the activation or use of a phone card (or any of the single or multifunction cards as described and claimed) that contains an ABA approved bank identification number through a banking network, **which banking network necessarily, by virtue of its being a banking network, incorporates and utilizes a bank processing hub**.

Defendants assert Mr. Dorf, in this June 24, 1999 Amendment, introduced the new claim limitation of "a banking network," and defined that term to "necessarily . . . incorporate[] and utilize[] a bank processing hub." Defendants argue the inventor's statement in amending the claims should limit the scope of the term "banking network."

None of the '608 patent or '787 patent claims were amended to require that the "banking network" must always incorporate and utilize a "bank processing hub." The '608 claims refer instead to a "processing hub," and Judge Everingham correctly pointed out that the patent specification refers to different types of processing hubs and demonstrates that the invention is not limited to the use of *bank* processing hubs. *IDT* Order at pg. 14.

17

The '787 patent claims recite a "bank processing hub computer," but they do not provide that the banking network must "incorporate and utilize" the bank processing hub computer.  The Court agrees with Alexam that the brief mention of a bank processing hub in the prosecution history does not rise to a clear and unambiguous statement defining banking network. *See Phillips*, 415 F.3d. at 1317 ("because the prosecution history represents an ongoing negotiation between the PTO and the applicant [], it often lacks the clarity of the specification and thus is less useful for claim construction purposes.").

Although Defendants assert the court was not fully apprised in previous cases of the significance of the June 24, 1999 amendment, the Court is not convinced that Judge Ward and Judge Everingham did not consider the full import of the amendment. In the *Datastream* case, the defendants recited the relevant statement in the June 24, 1999 Amendment.  Similarly, in the *IDT* case, the defendant recited the relevant statement in the June 24, 1999 Amendment, and Judge Everingham noted that IDT's argument was "persuasive," leading to a modification of Judge Ward's previous construction.

The Court will adopt Judge Everinghman's modified construction from the *IDT* case, referencing the incorporation and utilization of a processing hub.  However, the Court declines to construe "banking network" as requiring a network that incorporates and utilizes a bank processing hub computer.  Thus, the Court construes "banking network" to mean "a set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which incorporates and utilizes a processing hub."

2.    **"Bank Processing Hub Computer"**

a.    Parties' Positions

The parties propose the following constructions for "bank processing hub computer" which occurs in claims 1, 2, and 19 of the '787 Patent.

| Alexam | Defendants |
|---|---|
| A computer, other than a processing hub, **_that is maintained by a bank_**, that facilitates the card transaction and that is remote from the pre-existing standard retail point-of-sale device. | A computer, other than a processing hub, **_at a bank_** that facilitates the card transaction and that is remote from the pre-existing standard retail point-of-sale device. |

b.    Court's Construction

In the *Datastream* case, Judge Ward construed the term "bank processing hub computer" as Alexsam proposes here— a "computer, other than a processing hub, that is maintained by a bank, that facilitates the card transaction and that is remote from the pre-existing standard retail point-of-sale device." *Datastream* Order at pgs. 17-18. This construction was also adopted in the *UnitedHealth*, *IDT*, and *Pier 1* cases.

Based on the language in the specification describing the "bank processing hub computer," Defendants seek an adjustment of the construction such that the computer must be "at a bank." According to Defendants, this adjustment is necessary because Plaintiff has attempted to utilize the language "maintained by a bank" in prior cases to expand the scope of this claim term to include computers that should be considered outside the scope of the term in light of statements in the intrinsic record.

In the "Detailed Description of the Invention," the '608 patent states that the operator of the claimed card system "should also have a sponsoring bank whose bank processor 102 will

serve as the link between the processing hub 103 and the banking network." '608 patent at 5:4-7. With reference to Figure 2, the specification further states that the "retailer in method A (retailer A) has a central processor which controls each of its POS devices 105 and connects them to a processor 208 <u>at a bank</u> chosen by the retailer. Retailer B's POS device 105 connects directly to the bank processor 208." *Id.* at 5:43-47 (emphasis added). In further discussing Figure 2, the specification provides that in "methods C and D, the retailers' central processor 202 or POS device 105, respectively, again connect to a processor 209 at a retailer-chosen bank." *Id.* at 6:32-34.

According to Defendants, the specification indicates that the "bank processor 102," which is shown in Figure 2 as the "Sponsor Bank Processor;" "processor 208," which is shown in Figure 2 as the "Bank Processor;" and "processor 209," which is shown in Figure 2 as the "Bank Processor" correspond to the claimed "bank processing hub computer." The "processor 208" and the "processor 209" are explicitly described as being "at a bank," and Defendants assert the "bank processor 102" is described in language indicating that it is located at, or at least owned and operated by, a bank. Accordingly, Defendants argue their proposal that the "bank processing hub computer" be construed as a device "at a bank" follows the description of the "bank processing hub computer" found in the "Detailed Description of the Invention."

Judge Ward rejected a similar proposed requirement in the *Datastream* case. As noted by Judge Ward, the "bank processing hub computer" serves a function similar to the transaction processor recited in the '608 patent claims. "The difference is that the processor must be identified with a 'bank.'" *Datastream* Order at pg. 17.

According to Alexam, the '787 patent claims require only that the "bank processing hub

computer" be arranged within a network such that it communicates with retailer POS devices over a banking network and also communicates with a gift certificate card computer for activating and/or recharging gift certificate card accounts. Alexam further asserts the claims are silent as to the physical location of the bank processing hub computer, and they certainly do not require such a computer to be located "at a bank."

Figure 2 of the '787 patent and the accompanying text illustrate a number of examples of how retailer POS devices can be connected to the processing hub/ electronic gift certificate card computer that manages the accounts for the claimed card systems and methods. '787 patent at 5:39-7:3. Although the specification does not use the term "bank processing hub computer," as urged by Alexam, it teaches that several types of computers, such as those illustrated in Figure 2 alone or in combination, can serve the claimed "bank processing hub computer" function of communicating card data between retail POS devices and the processing hub or electronic gift certificate card computer. For example, the specification provides as follows:

> [T]he POS device 105 transmits the data either directly or via the central processor 201 to the bank processor 208. The bank processor 208 receives the data and transmits it over the debit network 107. The debit network 107 then forwards the data to the sponsoring bank's processor 102. As mentioned earlier, the sponsoring bank is one which has agreed to operate as a link between the debit network 107 and the processing hub 103.

'787 patent at 6:21-28. Thus, the disclosed retailer's central processor 201, the bank processor 208, and the sponsor bank processor 102 are each examples of bank processing hub computers, assisting in receiving and routing data between the POS device and the processing hub/gift certificate card computer. There is no indication that any such computers are always located at a bank.

In the *Datastream* Order, Judge Ward, after considering the intrinsic evidence, basically

construed the term "bank processing hub computer" as a transaction processor maintained by a bank. *Datastream* Order at pg. 18. The Court subsequently adopted Judge Ward's in the *UnitedHealth*, *IDT*, and *Pier 1* cases. The prior construction appropriately reflects the meaning of "bank processing hub computer" as used in the claims and is supported by the intrinsic evidence as a whole.

Thus, the Court construes "bank processing hub computer" to mean "a computer, other than a processing hub, that is maintained by a bank, that facilitates the card transaction and that is remote from the pre-existing standard retail point-of-sale device."

**3.     "Unmodified Existing Standard Point-Of-Sale Device" and "Unmodified Existing Standard Retail Point-Of-Sale Device"**

a.     Parties' Positions

"Unmodified existing standard point-of-sale device" appears in claim 60 of the '608 patent, and "unmodified existing standard retail point-of-sale device" appears in claims 1, 34, 50, and 57 of the '608 patent. The parties propose the following constructions for these terms.

**Unmodified Existing Standard Point-of-Sale Device:**

| Alexam | Defendants |
|---|---|
| A terminal for making purchases of the type in use as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware ***for use in routing transactions in the card system***. | A terminal for making purchases of the type in use as of July 10, 1997 and that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware ***for use in the card system.*** |

**Unmodified Existing Standard Retail Point-of-Sale Device**:

| Alexam | Defendants |
|---|---|
| A terminal for making purchases at a retail location *of the type in use* as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware *for use in routing transactions in the card system*. | A terminal for making purchases at a retail location of the type in use as of July 10, 1997 and that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware *for use in the card system.* |

b.      Court's Construction

With regard to these claims, Defendants seek the construction used in the *Datastream* case. Alexam requests "a minor clarification" relating to the phrase in the prior construction "for use in the card system." According to Alexsam, this clarification reflects the relevant "use" of the POS devices in the claimed systems and methods and is more consistent with the specification.

In the *Datastream* case, Judge Ward construed the term "unmodified existing standard retail point-of-sale device" to mean "a terminal for making purchases at a retail location of the type in use as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system." *Datastream* Order at pg. 9. This construction was adopted again by Judge Ward in the *IDT* case and by Judge Everingham in the *Pier 1* case. Similar constructions were also adopted for the similar term "unmodified standard point-of-sale device" by Judge Ward in the *Humana* case and by Judge Everingham in the *UnitedHealth* case. *Humana* Order at pg. 8; *UnitedHealth* Order at pg. 1.

In the *Datastream* case, the defendants asked the court to construe the term "unmodified" to limit the claims of the '608 patent to POS devices that have not been subject to any reprogramming, customization or alteration with respect to its software or hardware. *Datastream*

Order at pg. 7. Judge Ward construed "unmodified" to refer to a POS device that "has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware *for use in the card system*." *Id*. at pg. 9.  Judge Ward specifically noted as follows:

> One of the features of the '608 patent is the ability of the systems to use existing standard POS devices. As the specification and the prosecution history explain, use of the bank identification numbers made it unnecessary to saddle retailers with the start-up costs of new hardware and software to activate and accept the gift certificate, loyalty, and phone cards describe in the patents.

*Id*. at pg. 8. With respect to the term "unmodified," Judge Ward further observed:

> The examiner required the inclusion of that word [unmodified] to clarify that the systems claimed in the '608 patent did not require any hardware and/or software modifications to the existing standard retail POS devices.

*Id*. at pg. 9.  In each subsequent case, Judge Ward's original construction has been adopted.

The Court declines to amend the constructions to clarify that the POS terminal ". . .has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use *in routing transactions* in the card system." Alexsam's proposed broadening of the constructions is not supported in the intrinsic record.  In *Datastream*, Judge Ward found that the "Examiner required the inclusion of [unmodified] to clarify that the systems claimed in the '608 patent did not require **any** hardware and/or software modifications to the existing standard retail POS devices." *Datastream* Order at pg. 9.   Judge Ward was referring to an examiner's amendment during prosecution in which the examiner inserted the claim limitation "unmodified" directly before each recitation of an "existing standard retail point-of-sale device."  The examiner did not state that the term "unmodified" referred only to terminals not modified "for use in routing transactions," as Alexsam now proposes. Rather, as Judge Ward found in the *Datastream* case, the term "unmodified" precludes any modifications for use in the card system.

24

And, as urged by Defendants, the inventor stated in his June 24, 1999 Amendment that his invention required "no additional programming." The inventor further distinguished the Stimson prior art reference as teaching "the utilization of custom software at a point-of-sale location." As such, the inventor informed the Patent Office that his invention covered terminals that did not require any additional programming or custom software for using his card system.

Finally, Defendants assert the examiner, in a recent reexamination proceeding, confirmed that the Patent Office agrees with the court's prior construction of "unmodified." The Federal Circuit Court of Appeals has held that "[b]ecause an examiner in reexamination can be considered one of ordinary skill in the art, his construction of the asserted claims carries significant weight." *St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*, 412 Fed. Appx. 270, 276 (Fed. Cir. 2011) (reversing the district court's construction of a claim term based in part on statements made by Examiners in reexamination proceedings).

Here, in a September 21, 2010 Office Action, the examiner found that the Muehlberger prior art reference did not meet the "unmodified existing standard point-of-sale device" limitation of the '608 patent. *See* September 21, 2010 Office Action in Reexamination No. 90/009,793 at pgs. 11-12. The examiner noted that the point-of-sale device in Muehlberger used "unique encoding algorithms," and found that if "the POS terminal uses software having unique algorithms it cannot be said to be conventional or unmodified." *Id.* at pg. 12. The examiner did not limit the relevant modifications to only those that are "for use in routing transactions," but construed "unmodified" to refer to any modifications performed for using the card system. Especially considering the court's previous construction for this term, this interpretation is entitled to "significant weight" and provides additional support for Defendants' proposed

construction of "unmodified."

For all these reasons, the Court construes "unmodified existing standard point-of-sale device" as "a terminal for making purchases of the type in use as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system."  The Court construes  "unmodified existing standard retail point-of-sale device" to mean "a terminal for making purchases at a retail location of the type in use as of July 10, 1997, containing magnetic stripe reading electronics, that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system."

**4.      "Pre-existing Standard Retail Point-of-Sale Device"**

a.      Parties' Positions

The term "pre-existing standard retail point-of-device" appears in claims 1, 2, and 19 of the '787 patent.

| Alexam | Defendants |
|---|---|
| A terminal for making purchases at a retail location of the type in use as of July 10, 1997. | A terminal for making purchases at a retail location of the type in use as of July 10, 1997 ***and that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system.*** |

b.      Court's Construction

Alexam proposes the prior construction of the term ordered by the court in *Datastream*, *IDT*, *UnitedHealth*, and *Pier 1. Datastream* Order at pg. 18; *IDT* Order at pg. 17; *UnitedHealth* Order at pg. 2; *Pier 1* Order at pg. 2.  Defendants, by contrast, propose that the construction

require that the POS device "has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system." According to Alexsam, Defendants improperly seek the same construction for this term, "pre-existing standard retail point-of-sale device" as they propose for "unmodified existing standard (retail) point-of-sale device."

Defendants explain that the basis for their request is additional intrinsic evidence that has not previously been submitted to the court. Specifically, Defendants rely on statements made in two reexamination proceedings at the Patent Office which, according to Defendants, establish that the "pre-existing standard retail point-of-sale device" should be construed to mean an "unmodified" device. First, in a September 21, 2010 Office Action in Reexamination No. 90/009,789, Examiner Menefee stated that "the 'standard pre-existing' POS terminal is interpreted as being 'unmodified;' standard and pre-existing imply the device is simply off the shelf as typically used, not modified with software particularly for the invention." Second, in a September 22, 2011 Office Action in Reexamination No. 90/011,795, Examiner Hotaling stated that "the 'standard pre-existing' POS terminal is interpreted as being 'unmodified;' standard and pre-existing imply the device is simply off the shelf as typically used, not modified with software particularly for the invention."

In the *Pier 1* Order, Judge Everingham stated that Pier 1's arguments for construing the "pre-existing standard retail point-of-sale device" to mean an "unmodified" device were "not without force." However, he declined to adopt Pier 1's proposed construction, stating as follows:

> Although this argument is not without force, the relevant claim limitations require a bank processing hub; the court, therefore, is not convinced that the disclaimer in the '608 patent applies to the claims of the '787 patent. The patents were prosecuted to the same examiner, who insisted on the inclusion of certain

27

limitations to the '608 patent claims, but not to the '787 patent.  Given the differences in the claim language, the court is not convinced that the statements and amendments to the '608 claims should be imported into the '787 claims.  The court therefore rejects Pier 1's argument.

*Pier 1* Order at pgs. 1-2.  Defendants assert that given the court's statement that this issue was a close call in the *Pier 1* case, the new evidence from the reexamination proceedings should tip the balance in favor of adopting Defendants' proposal that the "pre-existing standard retail point-of-sale device" be construed as a device that "has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system."

The Court finds Judge Everingham's reasoning persuasive.  Although two separate examiners have stated that the standard pre-existing POS terminal is interpreted as being "unmodified," the examiners' comments do not justify inserting an unmodified requirement into the '787 claims.  As urged by Alexam, the comments are preliminary and do not contain thorough claim construction analysis (Tr. 88).   The Court finds no reason, based on the two identical comments made in reexamination proceedings, to depart from the court's earlier well-reasoned analysis.

As previously held by Judge Ward in *Datastream*, unlike in the '608 patent, none of the claims of the '787 patent contain the word "unmodified." *Datastrea*m Order at pg. 18. Defendants' proposed construction improperly seeks to import a limitation into the '787 patent claims that is not there. In sum, the words of the claims themselves simply do not permit interpreting "preexisting standard retail point-of-sale-device" as if it included the adjective "unmodified" where the applicant never included it and was not required by the Patent Office examiner to include it.

The Court defines this term to mean "a terminal for making purchases at a retail location

of the type in use as of July 10, 1997."   The Court declines to further restrict this term as proposed by Defendants.

**5.    "Encoded"**

This term appears in claims 1, 34, 50, 57, and 60 of the '608 patent and claims 1 and 19 of the '787 patent.

a.    Parties' Positions

| Alexam | Best Buy, Barnes & Noble, Gap, JC Penney, McDonald's, and Toys "R" Us | Home Depot |
|--------|--------|--------|
| This term is not ambiguous and does not need to be construed. If construed, "encoded" means "placed into a code." | Does not require construction. | Physically incorporated onto, such as by a bar code, printed or embossed on the surface of, or stored on the magnetic stripe of. |

b.    Court's Construction

Alexsam views "encoded" as an unambiguous term.   According to Alexam, "encoding" needs no construction and should be given its plain and ordinary meaning. Six of seven Defendants agree with Alexsam. If the Court determines that "encoded" should be construed, Alexsam proposes that it be construed as "placed into a code," a construction which follows the one given in the *Humana* case.[1] *Humana* Order at pg. 8.

By contrast, Home Depot asks the Court to construe "encoded" to require that information

---

[1] In *Alexsam, Inc. v. Humana Inc.,* Cause No. 2:07-cv-288-TJW (E.D. Tex.), the parties agreed on a construction of the term "encoded," and the court ordered the construction without its having been briefed. *Humana* Order at pg. 8. The only asserted claims in that case (claims 32 and 33 of the '608 patent) are not asserted in this case.

be "physically incorporated onto" the card in certain limited ways. According to Home Depot, the word "encoded" appears in claims 1, 34, 50, 57, and 60 of the '608 patent and in claims 1 and 19 of the '787 patent within the context of a "<u>card</u> having a unique identification number <u>encoded on it</u>." (emphases added). The word "encoded" also appears in claims 35 and 51 of the '608 patent (depending from claims 34 and 50 respectively), but under a different context of "the electronic gift certificate card activation amount is <u>encoded in the unique identification number</u>." (emphasis added).

Home Depot submits that the word "encoded" has a slightly different meaning in the two contexts on the basis that in one instance, a number is encoded on a card (a physical object), while in the other instance, a value is encoded in a number (an abstract rather than a physical object). Home Depot takes issue with Alexam's proposed alternative construction, asserting it is exactly the same construction Alexsam uses for "encrypted," thus improperly conflating "encoded" with "encrypted." *See* Alexsam P.R. 4-2(a) disclosures at 4. ("If construed, 'encrypted' means 'placed into a code.'").   Home Deport further asserts Alexsam fails to explicitly acknowledge the difference in the claims that require encoding on the card and the claims that require encoding in the unique identification number.

"Encoded" has a plain ordinary meaning. A definition of "encode" is "to convert (as a body of information) from one system of communication into another; *esp*: to convert (a message) into code." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 409 (1985).   The ordinary meaning of the term in the context of the claims does not limit where or how the information physically appears on a card.   That "encoded" appears in two different contexts within the claims does not render its meaning ambiguous or suggest that it has a different

meaning in each context. To the contrary, "encoded" has the same straightforward meaning in both claim limitations.

The jury will have no difficulty understanding the two claim limitations in which "encoded" appears. For example, the first limitation - "card having a unique identification number encoded on it" – is readily understandable and already reflects as written that the unique identification number is encoded on the card. This straightforward claim language presents no ambiguity that demands replacing it with a more complicated phrase as proposed by Home Depot. The purpose of claim construction is to clarify ambiguities, not to simply rewrite the claims using different words. *E.g., K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.")

Neither the plain meaning of "encoded" nor the full claim limitation limits where or how information physically appears on a card. The specification provides that the BIN can be encoded on the card by "any means known in the art:"

> The BIN is encoded on a magnetic strip 106 on each card 101 in the system 108 as a part of the card's identification number. Alternatively or additionally, the BIN and identification number could be encoded as a bar code, embossed on the surface on the card 101 in numerals for manual entry, *or provided by any other means known in the art*.

'608 patent at 4:40-46 (emphasis added). Home Depot's proposal that "encoded" necessarily requires that the ID number be "physically incorporated onto" the card in specified limited ways contradicts this teaching.  The ordinary meaning of the term "encoded" in the context of the claims simply does not limit where or how the information physically appears on a card.

The Court is of the opinion this term should be given its plain and ordinary meaning. Thus, the Court finds no construction is necessary for "encoding."

6.    **"Electronic Gift Certificate Card Activation Amount Is Encoded In The Unique Identification Number"**

a.    Parties' Positions

This term appears in claims 35 and 51 in the '608 patent.

| Alexam | Besy Buy, Barnes & Noble, Gap, JC Penney, McDonald's, and Toys "R" Us | Home Depot |
|---|---|---|
| This phrase does not need to be construed beyond the terms "electronic gift certificate card," "activation amount," "encoded" and "unique identification number." | Does not require independent construction. | The numeric value of the electronic gift certificate card activation amount is part of the unique identification number. |

b.    Court's Construction

For the reasons discussed above with the term "encoded," the Court is of the opinion this term should be given its plain and ordinary meaning.  Thus, the Court finds no independent construction is necessary for "electronic gift certificate card activation amount is encoded in the unique identification number."

7.    **"Swiping"/ "swiped"**

a.    Parties' Positions

The parties propose the following constructions for "swiping"  which is present in claim 60 of the '608 patent and claim 19 in the '787 patent.  In the '608 patent, claim 60 uses the term "swiping" in the context of "swiping the card through an unmodified existing standard point-of-sale device."  In the '787 patent, claim 19 uses the term "swiping" similarly in the context of "swiping said gift certificate card through a preexisting standard retail point-of-sale device."

32

| Alexam | Barnes & Noble, Gap, JC Penney, McDonald's, and Toys "R" Us | Home Depot and Best Buy |
|---|---|---|
| Passing or sliding a card through an electronic card reader | Passing or sliding a card through an electronic card reader | Sliding a card through an electronic card reader |

b.      Court's Construction

Alexsam's proposed construction of "swiping" and "swiped" follows the court's prior constructions of this term. *Datastream* Order at pg. 13; *IDT* Order at pg. 18; *UnitedHealth* Order at pg. 1; *Pier 1* Order at pg. 10. Five defendants agree with this construction.  Best Buy and Home Depot, however, contend that "swiping" should be construed as "sliding a card through an electronic card reader."

In the *Datastream* and *IDT* cases, the court rejected the proposed construction "sliding a card with a magnetically encoded stripe through a magnetic stripe reader." *Datastream* Order at pg. 13; *IDT* Order at pg. 18. In both cases, "swiping" was construed as "passing or sliding through an electronic card reader."  According to Best Buy, its proposed construction differs from the constructions that were rejected by the court during the two prior litigations in which the terms were in dispute. Best Buy acknowledges that the specifications of the patents-in-suit disclose alternatives to encoding data in a magnetic stripe, such as encoding data on a bar code or in the numeric data on the card surface. However, according to Best Buy, regardless of how the data is encoded or embossed on the card, the patents-in-suit do not disclose a method of reading the "card activation data" that involves "passing."

Best Buy points out that nowhere in the claims of either the '608 patent or the '787 patent does the word "passing" appear. The asserted claims specifically refer to a gift card being

"swiped through" a point-of-sale device in order to obtain "electronic gift card activation data" in the form of a "unique identification number . . . ." See, e.g., Ex. 2, '787 Patent, Claim 1(b). The claims also state that the "unique identification number" is "encoded on" the gift card. *Id.*, Claim 1(a). Best Buy asserts, in this context involving a physical item such as a point-of-sale device, "swiping through" has an ordinary and customary meaning of putting or introducing an object into one point of the body of the device such that the object exits out at another point in the body of the device. According to Best Buy, to dispense with the requirement of physical contact in and out of the device would impermissibly read the "swiping through" limitation out of the asserted claims.

The specification discloses multiple types of point of sale devices:

> In order to achieve the desired functionality, the system 108 uses existing banking networks in a unique and novel way to gain access to virtually all existing retail point-of-sale (POS) devices 105. These devices 105 include stand-alone POS terminals, cash registers with POS interfacing, computers with POS interfacing, and other similar devices which can be used to access the banking system. As used herein, POS device includes all such devices, whether data entry is effected by swiping a card through the device or by manual entry.

'608 patent at 4:24-35. According to Alexsam, any attempt to exclude the use of cards in which activation data is encoded in a bar code from the patent claims contradicts the specification:

> The BIN is encoded on a magnetic strip 106 on each card 101 in the system 108 as a part of the card's identification number. Alternatively or additionally, *the BIN and identification number could be encoded as a bar code, embossed on the surface on the card **101 in numerals for manual entry, or provided by any other means known in the art***.

'608 patent at 4:40-46 (emphasis added).

Alexsam persuasively argues the patent uses "swiping" in a general way as a means of differentiating between (and including both) a point of sale device reading data encoded on a card

(for example, card reader or bar code reader) and manual entry of the data (*e.g.,* by keyboard or

PIN pad):

> In order to achieve the desired functionality, the system 108 uses existing banking networks in a unique and novel way to gain access to virtually all existing retail point-of-sale (POS) devices 105. These devices 105 include stand-alone POS terminals, cash registers with POS interfacing, computers with POS interfacing, and other similar devices which can be used to access the banking system. As used herein, POS device includes all such devices, *whether data entry is effected by swiping a card through the device or by manual entry*.

'608 patent at 4:24-35 (emphasis added).   Best Buy disagrees, asserting this portion of the

specification relates to encoding data and not to reading the encoded data.   According to Best

Buy, if anything, this portion of the specification discloses that encoding a BIN number as a bar

code—like the manual entry of numerals embossed on the card surface—is an alternative to

encoding a BIN number on a magnetic strip. However, this portion of the specification does not

discuss how to read the encoded BIN number.   Pointing to elsewhere in the specification, where

the patentee references the process for reading the encoded data at the point-of-sale device, Best

Buy asserts that, regardless of whether gift cards are encoded via a magnetic stripe or bar code,

for "swiping" to occur they must make physical contact through the point-of-sale device.

Although this issue is a closer one, the Court is not convinced by Best Buy's arguments.

First, it does not necessarily follow, as it appears Best Buy believes, that deleting the word

"passing" from the Court's construction would prevent the claims from reading on systems that

read gift card transaction data from a bar code. According to Alexsam, the verb "sliding" equally

applies to the act of activating a bar code encoded gift card by sweeping it through a bar code

reader.  And, to the extent that Best Buy's proposed construction would limit the claims to the use

of magnetic stripe readers and exclude bar code readers, the Court rejects it as an improper

attempt to limit the claim to exclude subject matter disclosed in the patent specification and intended to be covered by the claims. Judge Ward twice previously rejected proposals limited to magnetic stripe readers. *Datastream* Order at pg. 13; *IDT* Order at pg. 18.

Best Buy's argument that the ordinary meaning of "swiping through" requires physical contact is not supported in the claims or the specification and  contradicts the prosecution history. The ordinary definition of the word "swipe" is "to strike or wipe with a sweeping motion." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1194 (9th ed. 1985). This definition indicates a broader usage than acts involving physical contact. The prior constructions in this district, "passing or sliding a card through an electronic card reader," which are not limited to physical contact," correctly reflect the meaning of "swiping" in the context of the patent-in-suit.

Best Buy concedes the specification explicitly discloses that "the BIN and identification number could be encoded as a bar code." '608 patent at 4:40-46 ("this portion of the specification discloses that encoding a BIN number as a bar code—like the manual entry of numerals embossed on the card surface—is an alternative to encoding a BIN number on a magnetic strip"). Persons of ordinary skill in the art understand that point-of-sale devices read bar codes using electronic bar code readers which do not require physical contact with the bar code. Although Best Buy asserts the patent allows for *encoding* transaction data on a bar code but does not suggest *reading* information from a bar code, the patent need not expressly describe the well-known reading of a bar code using standard point-of-sale equipment for this to be within the scope of the disclosed invention.  As urged by Alexsam, reading the cards with a bar code inherently and logically flows from the disclosure of the use of bar codes and standard point-of-sale equipment in the invention. *See, e.g., Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355,

36

1368 (Fed. Cir. 2011) (a "patent applicant need not include in the specification that which is already known to and available to a person of ordinary skill in the art.").

In this regard, the specification's disclosure that the invention may be implemented with a broad variety of point of sale devices for reading information on the cards:

> In order to achieve the desired functionality, the system 108 uses existing banking networks in a unique and novel way to gain access to virtually *all existing retail point-of-sale (POS) devices* 105. These devices 105 include stand-alone POS terminals, cash registers with POS interfacing, computers with POS interfacing, and other similar devices which can be used to access the banking system. As used herein, POS device includes *all such devices*, whether data entry is effected by swiping a card through the device or by manual entry.

'608 patent at 4:24-35 (emphasis added). This teaching includes point-of-sale devices that include bar code readers. Contrary to Best Buy's arguments, this passage does not exclude reading bar codes from the term "swiping."

For all these reasons, the Court construes the term "swiping" as "passing or sliding a card through an electronic card reader."

## V. Conclusion

The Court hereby orders the claim terms addressed herein construed as indicated. A chart summarizing these constructions is attached as Exhibit A.

The parties are further ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual constructions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 9th day of April, 2012.**

3

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE

**Exhibit A**

| Agreed Claim Term | Court's Construction |
|---|---|
| Activation amount | A value used to establish the total value of goods or services that the user may obtain upon the prepaid account being made functional for use. |
| Activating an account | Making an account functional for use. |
| Bank identification number approved by the American Banking Association for use in a banking network | A numeric code which identifies a card issuing financial institution and that is sanctioned by the American Bankers Association. |
| Electronic gift certificate card | A prepaid card that operates through an exchange of electronic signals and that can be used in lieu of cash. |
| Gift certificate card account balance | A prepaid amount of funds available for use by a user of the electronic gift certificate card. |
| Gift certificate card computer | A computer that processes data related to multiple gift certificate cards and their accounts. |
| Means for activating an account corresponding to the electronic gift certificate card with a balance equal to the electronic gift certificate activation amount | Function: activating an account corresponding to the electronic gift certificate card with a balance equal to the electronic gift certificate activation amount.<br><br>The means for activation is the processing hub 103. |
| Means for allowing a user of the electronic gift certificate card to purchase goods and services | Function: allowing a user of the electronic gift certificate card to purchase goods and services having a value up to the balance of the account corresponding to the electronic gift certificate card.<br><br>The corresponding structure is the processing hub which issues the approval code. |
| Means for decreasing the balance of the account corresponding to the electronic gift certificate card | Function: decreasing the balance of the account corresponding to the electronic gift certificate card by the value of the goods and services purchased. |

|  | The corresponding structure is the processing hub. |
|---|---|
| Means for receiving electronic gift card activation data from an unmodified existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device | Function: for receiving electronic gift certificate card activation data from an unmodified existing standard retail point-of-sale device when said electronic gift certificate card is swiped through the point-of-sale device.<br><br>The corresponding structures include the pathways for receiving the data from the POS device, which include the various combinations of the retailer processors, the bank processor, the debit network, and the processing hub as shown in Figure 2, and equivalents thereof. |
| Processing hub | A computer which provides front-end point-of-sale device management and message processing for card authorizations or activations. |
| Recharge | Purchase value for a previously activated card. |
| Recharging | Purchasing value for a previously activated card. |

| Disputed Claim Term | Court's Construction |
|---|---|
| Banking network | A set of interconnected computers used by banks and financial institutions for purposes of conducting and processing financial transactions, and which incorporates and utilizes a processing hub. |

| Bank processing hub computer | A computer, other than a processing hub, that is maintained by a bank, that facilitates the card transaction and that is remote from the pre-existing standard retail point-of-sale device. |
| --- | --- |
| Unmodified existing standard point-of-sale device | A terminal for making purchases of the type in use as of July 10, 1997 that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system. |
| Unmodified existing standard retail point-of-sale device | A terminal for making purchases at a retail location of the type in use as of July 10, 1997, containing magnetic stripe reading electronics, that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system. |
| Pre-existing standard retail point-of-sale device | A terminal for making purchases at a retail location of the type in use as of July 10, 1997. |
| Encoded | No construction necessary. |
| Electronic gift certificate card activation amount is encoded in the unique identification number | No construction necessary. |
| Swiping/swiped | Passing or sliding a card through an electronic card reader. |